IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

In re R.C.G.J., a minor.	CASE NO. 5:16cv69-RH/GRJ

_____/

ORDER ON THE MERITS

This is an international child-custody dispute. The child once lived with both parents in Honduras; that was the family's domicile. The mother and child moved to the United States. The father approved the move, but only with a specified return date. The mother and child did not return. The father filed this action under the Hague Convention on the Civil Aspects of International Child Abduction and the statute implementing it. The critical issue is the child's "habitual residence" when the mother's retention of the child allegedly became "wrongful"—that is, on the date when the father says the mother and child were obligated to return to Honduras but instead remained in the United States. Following a nonjury trial, this order sets out the court's findings of fact and conclusions of law and directs the entry of judgment.

I

For ease of reference and, more importantly, to protect the privacy interests of the child, *see* Fed. R. Civ. P. 5.2(a)(3), this order refers to the relevant family

members by their position in the family: the father, the mother, and the child. This is so even for the period before the father and mother were married and before the child was born. The order sometimes refers to the father and mother collectively as the parents or the parties.

## II

The father is a native of Honduras. The mother is a native of the United States. She moved to Honduras in 2002 and met the father in 2007. They were married in 2009. The wedding occurred in Las Vegas, but the parties' home before and after the wedding was in Honduras. The Honduran government granted the mother's application for permanent residency based on the marriage. Neither the father nor the mother had any intention at that time to move to the United States. Honduras was their domicile.

The child was born in Honduras in February 2011. He was a citizen of Honduras and also, because of his mother's citizenship, a citizen of the United States. The mother and child visited the United States twice in 2011 and again in April 2012, not intending to stay.

In September 2012, the father, mother, and child traveled to the United States for the mother's cousin's wedding. Before going, they booked a return flight for two weeks later. The father became irrationally upset at the mother's participation in the wedding. On the drive back from the wedding to the place where the parties were staying, the father physically assaulted the mother, injuring her. The father

left the United States the next day—six days before the scheduled return flight. He was experiencing medical issues and traveled to Nicaragua for treatment before returning to Honduras. The mother and child stayed in the United States. The mother knew at that point that the marriage was over.

The mother returned to Honduras with the child in November 2012 and entered into negotiations with the father to end the marriage. The mother was represented by an attorney. The father, who is himself an attorney, also was represented by one or more attorneys. The parties signed a written agreement on January 31, 2013. Pet'r's Ex. 18.

The agreement said the parties "through this act mutually agree to end their marriage." *Id.* § 8. The agreement provided for shared parental responsibility and joint custody and set out financial terms including the father's payment of alimony and child support. The agreement said the parties' domicile was and would remain Honduras, but the parties intended for the child to reside primarily with the mother. To that end, the agreement provided for the mother and child to travel to the United States for up to three years, beginning within a few days, while the mother studied nursing, with return visits to Honduras for spring break, summer, and the year-end holidays. *Id.* § 2. The agreement provided that after the mother completed her nursing studies, the father could "keep issuing authorizations so that the minor spend time with his mother in the USA while she works as a nurse." *Id.* § 10. The

agreement set no limit on the number or ultimate duration of any such "authorizations."

A divorce petition was filed on February 1, 2013, as contemplated by the parties' agreement. The mother and child traveled to the United States on February 2, 2013. The mother leased a single-family home in Port St. Joe, Florida, which has remained the primary residence of the mother and child since that time.

The mother thought she was divorced. She studied nursing, worked, and cared for the child—much as any single parent might do. For his part, the father intended to continue to live in Honduras and to retain his *ne exeat* right—his right to insist that the child be brought back. But the father did not intend to ever again have primary physical custody of the child; his intent was to have the right of control but not to bear the burden that comes with actually keeping the child in his residence. The father knew, but did not tell the mother, that the divorce petition had been abandoned; the parties were still married.

While the mother and child were in the United States, the father sought to exercise control over the mother's life to an extent that could reasonably be labeled long-distance stalking.

The child's residence during 2013 and 2014 was in Port St. Joe, but he visited Honduras, and the father visited him in the United States. The father, mother, and child visited Disney World during the 2013 Christmas holidays. During that trip, the father took the mother's cellular telephone while she slept,

reviewed its contents, and accosted the mother in the middle of the night, at one point pushing her. He berated her in person and, in the ensuing days, through texts. It was domestic abuse.

The father traveled to Port St. Joe in December 2014. With the mother's consent, the father took the child back to Honduras to visit. The child's return to the United States was scheduled for December 28. The mother traveled to the Pensacola airport to meet the child's return flight, but the child was not aboard. The father kept the child in Honduras, conjuring a false allegation of sexual abuse by the mother's step-father.

The mother traveled to Honduras on January 6 or 7, 2015, and enlisted the assistance of the American Embassy and Honduran officials in an attempt to reclaim the child. The father enlisted the assistance of local officials. The father got the best of it in the Honduran legal system; a court awarded the father temporary custody.

The parties entered into negotiations in an effort to resolve their dispute. The father moved out of his residence so that the mother could move in and exercise physical custody over the child while efforts to resolve the dispute went forward. The mother began making arrangements to move to Honduras, intending to do so if she would otherwise lose custody of the child. The father wished to retain the right to control the child—as well as the mother—but the father did not wish to bear the burden of actually exercising physical custody of the child.

In March or April 2015, as negotiations dragged on, the father insisted, as a condition of agreeing that the child could go back to the United States with the mother, that the mother have sex with the father and allow him to make a video recording of the encounter. Desperate, the mother did it. The father made good on his promise, agreeing to modifications of the 2013 agreement under which the mother and child could return to the United States.

The Honduran court entered an order on April 23, 2015, approving the modifications. Pet'r's Ex. 62. The order provided that the mother and child could immediately leave Honduras for the United States so that the mother could have urgent dental treatment. The order also provided, as contemplated by the 2013 agreement, that the mother and child could stay in the United States while the mother continued to study nursing. The order retained the requirement for visits to Honduras, scheduling the first to begin on July 11, 2015. The order put the updated expectation on the duration of the mother's nursing studies at two more years—that is, until spring 2017. The order made no change in the provision allowing the father to keep issuing authorizations for the child to stay with the mother in the United States while she worked as a nurse, after the completion of her studies—that is, in 2017 and beyond. Indeed, in an email exchange during the negotiations, the father referred to the parties' expectation that the child would attend high school in the United States. Pet'r's Ex. 46. The child's high-school graduation was likely 14 years away.

The mother and child promptly returned to the United States. They did not return to Honduras on July 11 as their agreement—and the April 23 order—ostensibly required. Nearly eight months later, on March 2, 2016, the father filed this action, demanding the return of the child to Honduras.

### III

The parties' dispute is governed by the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 19 I.L.M. 1501 ["Convention"] and the statute implementing it, 22 U.S.C. §§ 9001–9011. "The Convention and [the statute] empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." 22 U.S.C. § 9001(b)(4). So the sole question in this case is whether the Convention and statute require the child's return to Honduras. The general framework for addressing that question is set out in *Ruiz v. Tenorio*, 392 F.3d 1247 (11th Cir. 2004). *See also Seaman v. Peterson*, 766 F.3d 1252 (11th Cir. 2014). No purpose would be served by recounting the entire framework here.

The father, as the petitioner, has the burden of establishing by the preponderance of the evidence "that the child has been wrongfully removed or retained within the meaning of the Convention." 22 U.S.C. § 9003(e)(1)(A). The child was not wrongfully *removed* from Honduras; he left in the mother's care with the father's consent. As the father made clear during closing argument in the trial in this court, the father's contention is that the child was wrongfully *retained* on

July 11, 2015, when the mother retained the child in the United States, contrary to the parties' agreement and the Honduran court's order.

> The Convention defines wrongful removal or retention:
>
>> The removal or the retention of a child is to be considered wrongful where—
>>
>> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State *in which the child was habitually resident immediately before the removal or retention*; and
>>
>> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>>
>> The rights of custody mentioned in sub-paragraph a) above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Convention, art. 3 (emphasis added). As this language makes clear, the father is entitled to prevail in this action only if "the child was habitually resident [in Honduras] immediately before" July 11, 2015, when the mother retained the child in the United States.

Habitual residence is an intensely factual inquiry. *See Ruiz*, 392 F.3d at 1251-52; *Seaman*, 766 F.3d at 1258-59. What matters is the *child's* habitual residence, not the parents'. But the parents are ordinarily entitled to determine a child's residence, and this is especially true for a child this young. A useful starting point for determining a child's habitual residence is the parents' last shared intent.

Case No. 5:16cv69-RH/GRJ

Even so, "parental intent cannot alone establish a child's habitual residence." *Gitter v. Gitter*, 396 F.3d 124, 133 (2d Cir. 2005); *see also Ruiz*, 392 F.3d at 1253 (stating that the parents' settled intention is a "crucial factor" but "cannot alone transform the habitual residence"). In *Gitter*, the Second Circuit adopted a standard that is perhaps less flexible than the Eleventh's, as set out in *Ruiz* and *Seaman*, but that is generally sound and ordinarily will produce the same result:

> In sum, we conclude that in determining a child's habitual residence, a court should apply the following standard: First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations. Normally the shared intent of the parents should control the habitual residence of the child. Second, the court should inquire whether the evidence unequivocally points to the conclusion that *the child has acclimatized to the new location and thus has acquired a new habitual residence*, notwithstanding any conflict with the parents' latest shared intent.

*Gitter*, 396 F.3d at 134 (emphasis added).

In our case the child was born to two parents who were living together and had the shared intent to remain in the country of birth. Only one of the parents ever changed that intent. The child is not old enough to have any intent at all on this subject. In circumstances like this, the country of birth—the last place the parents resided with the shared intent to remain—will almost always be the child's habitual residence. Almost always, but not always. This case is the exceedingly rare exception.

At least two related considerations make this case atypical.

Case No. 5:16cv69-RH/GRJ

First, with the approval of both parents, the child has lived most of his life in the United States.  He is well acclimated here.  The record unequivocally supports that conclusion.  The child last lived permanently in Honduras in September 2012 at age 19 months.  The child was age 53 months when the father says he should have returned to Honduras, and age 61 months when this action was filed.  To the extent a five-year-old can have his own habitual residence, this child's habitual residence is plainly the United States—the place where he is living and, with the approval of both parents, has lived most of his life.

Second, both parents have intended all along that the child will live with the mother.  The father has insisted on his right to control the child and even the mother, but the father has never wished to have separate physical custody of the child.  The actual expectation, of the father as well as the mother, has been that the child will live with the mother in the United States at least until 2017 and probably through high-school graduation in 2029, when the child will be free to make his own decision about where to live.  The father has known, since he assaulted the mother in 2012, that she would not voluntarily live in Honduras—that she would live in Honduras only if that was the only way she could maintain physical custody of the child. Knowing this, the father nonetheless acquiesced in the mother and child living in the United States.  In sum, "the circumstances surrounding the child's stay [in the United States] are such that, despite the lack of perfect consensus," the parents "shared a settled mutual intent that the stay last

indefinitely." *Ruiz*, 392 F.3d at 1253, quoting *Mozes v. Mozes*, 239 F.3d 1067, 1077 (9th Cir. 2001). At least, that *was* their shared and settled mutual intent as of the critical date, July 11, 2015.

To be sure, the mother signed an agreement in January 2013 designating the child's habitual residence as Honduras. The mother agreed in April 2015 to entry of an order confirming that provision. But the mother was a battered wife acting under duress. And, more importantly, what the parties *said* about habitual residence was different from what they agreed *to do* about habitual residence in fact. The parties agreed that the mother and child would move to the United States and remain until 2016—a date later extended to 2017—and the parties included a provision for extending the period of residence in the United States indefinitely. The parties contemplated that the child would remain in the mother's physical custody and would stay in the United States for an extended period—probably through high school. There was no reason to believe the child would ever actually move back to Honduras.

In sum, the child's habitual residence, as of July 11, 2015, when he was retained in the United States, was the United States. The father is not entitled to relief in this action.

IV

For these reasons,

IT IS ORDERED:

Case No. 5:16cv69-RH/GRJ

1.  The clerk must enter judgment dismissing the petitioner's claims on the merits.

2.  The clerk must close the file.

SO ORDERED on June 8, 2016.

>  s/Robert L. Hinkle
>  United States District Judge